## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

MARGARET J. DIAZ, Regional Director of
the Twelfth Region of the National Labor
Relations Board, for and on behalf of the
NATIONAL LABOR RELATIONS BOARD,

        Petitioner,

v.                                  Case No. 3:13-cv-1447-J-34JRK

PROFESSIONAL TRANSPORTATION,
INC.,

        Respondent.
_____/

## O R D E R

      **THIS CAUSE** is before the Court on the Petition for Preliminary Injunction Under

Section 10(j) of the National Labor Relations Act (Doc.1; Petition), filed by Petitioner

Margaret J. Diaz ("Regional Director"), Regional Director of the Twelfth Region of the

National Labor Relations Board ("Board" or "NLRB") on November 25, 2013.  The Regional

Director seeks a preliminary injunction under § 10(j) of the National Labor Relations Act, as

amended, 29 U.S.C. § 160(j) ("NLRA").  See Petition at 1.  In support of the Petition, the

Regional Director filed Petitioner's Memorandum of Points and Authorities in Support of

Petition for Injunctive Relief Pursuant to Section 10(j) of the National Labor Relations Act

(Doc. 3; Regional Director Memo) on November 25, 2013.  Also in support of the Petition,

the Regional Director provided the transcript of an administrative hearing held before

Associate Chief Administrative Law Judge William Case in Board Case 12-CA-101034

(Docs. 1-3, 1-4; Petitioner's Exhibit 1; ALJ Tr.); a composite exhibit comprised of the exhibits

entered in evidence during the administrative hearing, marked as General Counsel Exhibit 1(a) through General Counsel Exhibit 18 (Docs. 1-5, 1-6; Petitioner's Exhibit 2; GC Ex. 1(a)-18); and the October 22, 2013, Decision of the NLRB Administrative Law Judge in the NLRB Case 12-CA-101034, JD (ATL)-27-13 (Doc. 1-7; Petitioner's Exhibit 3; ALJ Decision).

On December 5, 2013, the Court held a Telephonic Status Conference to determine whether the parties intended to proceed with an evidentiary hearing or whether the Court should rely solely on the written evidentiary submissions.  At the hearing, the Regional Director and Respondent Professional Transportation, Inc. ("PTI" or the "Company") disagreed over the necessity of an evidentiary hearing.  As a result, the Court requested briefing on the issue (Doc. 10; December 5, 2013 Order).  On December 17, 2013, the Regional Director filed Petitioner Diaz's Memorandum in Support of the Court Ruling on the Petition Without Holding an Evidentiary Hearing (Doc. 16; Regional Director Hearing Memo), asserting that the Court should rule on the Petition based solely on the written evidentiary submissions. See generally Regional Director Hearing Memo.  The Regional Director further advised the Court that PTI had determined that it would not submit an argument that live testimony should be heard by the Court.   Regional Director Hearing Memo at 1 n.1. Consistent with this representation, PTI filed no briefing on the issue.

Although opting not to present live evidence, PTI opposes the Regional Director's Petition, and filed Professional Transportation's Memorandum in Opposition to the Regional Director's Petition for Preliminary Injunction (Doc. 18; PTI Memo) on December 17, 2013. In response, the Regional Director filed Petitioner Diaz's Reply to Respondent's Memorandum (Doc. 19; Regional Director Reply).  On January 7, 2014, the undersigned

held a hearing on the Petition (Hearing Tr.).  <u>See</u> December 5, 2013 Order; Clerk's Minutes (Doc. 21).   Having reviewed the written evidentiary submissions of the parties and considered the arguments of counsel, the Petition is ripe for resolution.

## I.    Background

This action arises from an unfair labor practice charge filed by the International Brotherhood of Teamsters, Local 512 ("Union"), on March 25, 2013.  In the unfair labor practice charge, the Union alleged that PTI "engaged in bad faith bargaining by cancelling scheduled negotiations for a first time contract with [the Union]" in violation of §§ 8(a)(1) and (5) of the NLRA, 29 U.S.C. § 158(a)(1) and (5).  GC Ex. 1(a).  Upon consideration of the allegations, the Regional Director issued a complaint on May 31, 2013, and an amended complaint on July 25, 2013.[1]  GC Exs. 1(d),  1(l).  PTI filed answers, to both the original and the amended complaint, denying that it committed any unfair labor practices. GC Exs. 1(h), 1(k).  The parties appeared for an administrative hearing before NLRB Administrative Law Judge William Nelson Cates ("the ALJ") on August 8, 2013.  <u>See</u> <u>generally</u> ALJ Tr.  On October 22, 2013, Judge Cates issued a decision in which he found that PTI violated the NLRA as alleged,[2] and ordered PTI to bargain in good faith at reasonable times and places with the Union.  <u>See</u> <u>generally</u> ALJ Decision.  Arguing that a substantial amount of time may pass before the Board issues a final order in the NLRB administrative proceedings, the

---

[1] The Regional Director's amended complaint included new allegations relating to PTI's alleged conditional bargaining.  <u>See</u> <u>infra</u> Background, Part C.

[2] The ALJ found that PTI "violated the [NLRA] essentially as alleged in the complaint."  ALJ Tr. at 2.  However, because the ALJ made findings of fact and conclusions of law related to PTI's alleged conditional bargaining; <u>see</u> ALJ Tr. at 4-6, 8-10; the Court notes that the ALJ's decision was based on the allegations in the Regional Director's amended complaint, not the original complaint.

Regional Director now seeks interim injunctive relief from this Court pursuant to § 10(j) of the NLRA.  <u>See</u> Regional Director Memo at 3-4.

In the Petition before the Court, the Regional Director seeks an order enjoining PTI from: (1) failing and refusing to meet at reasonable times and places and failing to bargain in good faith with the Union as the exclusive collective-bargaining representative of the Unit; (2) failing and refusing to bargain collectively in good faith with the Union for an initial agreement by cancelling meetings previously scheduled with the Union; (3) conditioning bargaining with the Union on its agreement that if a court of competent jurisdiction determines that the Board lacked a proper quorum at the time the Union was certified as the collective-bargaining representative of the Unit, any collective-bargaining agreement that has been reached will be null and void and recognition of the Union will be considered withdrawn, or on the Union's agreement to any other improper condition for bargaining; and (4) in any like or related manner interfering with, restraining or coercing employees in the exercise of rights guaranteed in § 7 of the NLRA. <u>See</u> Petition at 8-9.  The Regional Director also requests that the injunction require PTI to: (1) on request, meet and bargain in good faith with the Union as the exclusive collective-bargaining representative of PTI's Unit employees not less than 24 hours per month, at least 6 hours per session, or on another schedule to which PTI and the Union have mutually agreed, with respect to wages, hours of work, and other terms and conditions of employment and, if an understanding is reached, embody such understanding in a signed agreement; (2) post the District Court's order, and maintain the posting during the Board's administrative proceedings, free from all obstructions and defacements, and grant agents of the Board reasonable access to PTI's facility to monitor

compliance with the posting requirement, and mail the District Court's order to Unit employees at their home addresses; and (3) within twenty (20) days of issuance of the District Court's order, file with the District Court and submit a copy to the Regional Director of the Twelfth Region of the Board, a sworn affidavit from a responsible official of PTI setting forth with specificity the manner in which Respondent has complied with the terms of the order, including how and where it posted the documents required by the order. See id. at 9-10.

### A.     Certification of the Union

PTI provides crew transportation services to railroad industry companies in Florida, Georgia, and throughout the United States.  ALJ Decision at 2.  In the spring of 2012, the Union filed a petition with the Board's Tampa, Florida Regional Office seeking to represent a unit of PTI's drivers (the "Unit"), defined as follows:

> All full time and regular part-time over the road and local drivers working from the Respondent's Jacksonville, Florida facility; excluding: all other employees guards and supervisors as defined in the Act.

ALJ Decision at 2-3 (alteration omitted); ALJ Tr. at 30. The parties entered into a Stipulated Election Agreement on April 20, 2012, which Diaz, then Acting Regional Director, approved. ALJ Decision at 2; GC Ex. 3.  PTI asserts, upon information and belief, that Diaz was appointed Regional Director in May 2012.  PTI Memo at 9.  Eligible Unit employees participated in a representation election on May 16 and 17, 2012, and a majority of employees voted in favor (a vote of 44 to 23) of selecting the Union to represent them for the purposes of collective-bargaining.  ALJ Decision at 2-3; GC Ex. 2.  On June 5, 2012, Diaz

certified the Union as the exclusive collective-bargaining representative of the Unit.  ALJ Decision at 3; GC Ex. 4.

### B.      Negotiations between the Union and PTI

On June 5, 2012, Union President and Business Manager, Jim Shurling, contacted PTI Vice-President Steve McClellan, requesting that PTI provide dates to begin negotiations for an initial collective-bargaining agreement.  ALJ Decision at 3; ALJ Tr. 31-32; GC Ex. 5. PTI's counsel Ronald Pfeifer emailed Shurling on June 12, 2012, stating that he would be assisting PTI in negotiations, and PTI Vice-President Bob Tevault would be the Union's point of contact.  ALJ Decision at 3; GC Ex. 6.  Shurling emailed Tevault on June 19, 2012, requesting dates in July or August for possible meetings.  GC Ex. 7.  On July 3, 2012, Pfeifer contacted Shurling to advise that Tevault had an usually busy July, and asked Shurling to provide August dates for negotiations.  ALJ Decision at 3; GC Ex. 8.  Shurling responded that same day suggesting August 16, 17, 30, and 31, 2012.  GC Ex. 9.  Tevault was unavailable on those dates.  Regional Director Memo at 6.  PTI and the Union eventually met for their first bargaining session on September 25, 2012, at which time the Union presented 33 non-economic proposals to PTI, and PTI presented no proposals.  ALJ Decision at 3; ALJ Tr. at 38-39.  The parties then agreed to meet on November 15 and 16, 2012.  Id.

At the November 15 meeting, PTI presented no proposals of its own and no responses to the Union's proposals, but on November 16, PTI did make some counter-proposals.  ALJ Decision at 3; ALJ Tr. at 40-41.  The parties met again on January 24, 2013, and at this meeting, PTI, again, did not offer any new proposals but did make some counter-proposals.  ALJ Decision at 3; ALJ Tr. at 41-42.  At this meeting, Shurling expressed concern

that bargaining "was dragging" due to the length of time between sessions and the brevity of the meetings.  ALJ Decision at 3, 3 n.5; ALJ Tr. at 42.  As a result, at this January 24, 2013 meeting, the parties agreed to meet on February 21 and 22, 2013, and again on March 5, 6, and 7, 2013.  ALJ Decision at 3; ALJ Tr. at 42.  In the interim, on January 25, 2013, the United States Court of Appeals for the District of Columbia issued its decision, Noel Canning v. N.L.R.B., 705 F.3d 490 (D.C. Cir. 2013), cert. granted, 133 S. Ct. 2861 (2013), a decision that would have a significant effect on the upcoming negotiations.[3]

## C.    Noel Canning and PTI's Alleged Unfair Labor Practices

On or about February 11, 2013, Shurling emailed Tevault to confirm the February 21 and 22 bargaining dates.  ALJ Decision at 3; GC Ex. 13.  Tevault responded on February 13, stating that PTI was "working on proposals/counters" but that "[n]ext week is not going to work," and as such, cancelled the February 21 and 22 meetings.  Id.  Tevault also emailed Shurling on February 25, advising that he had a conflict with the March 5, 6, and 7

---

[3] In Noel Canning, the United States Court of Appeals, District of Columbia Circuit, held that President Obama's three intrasession recess appointments to the NLRB on January 4, 2012, were invalid under the "Recess Appointments Clause" of the United States Constitution. Noel Canning, 705 F.3d at 506-07, 514.  The recess appointments clause provides that  "[t]he President shall have Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session." U.S. Const., art. II, § 2, cl. 3. The D.C. Circuit Court held that the meaning of "the Recess" in that clause "should be taken to mean only times when the Senate is not in session," meaning intersession recesses, not intrasession recesses. Id. at 500.  The court also held that "the filling up of a vacancy that happens during a recess must be done during the same recess in which the vacancy arose."   Id. at 514.   Therefore, since the NLRB vacancies did not arise during the intersession recess of the Senate and because the appointments were intrasession appointments and not intersession appointments, the appointments were held unconstitutional. Id. at 506-07, 514. Because the NLRB "must have a quorum of three in order to take action," in determining that "three members of the five-member Board were never validly appointed," the Court concluded that the Board's decision finding that the employer violated §§ 8(a)(1) and (5) of the NLRA was void. Id. at 493. Two other circuits have since followed Noel Canning, ruling unconstitutional President Obama's intrasession recess appointments. See N.L.R.B. v. Enterprise Leasing Co. Se., LLC, 722 F.3d 609 (4th Cir. 2013); N.L.R.B. v. New Vista Nursing and Rehabilitation, LLC, 719 F.3d 203 (3d Cir. 2013).

bargaining dates and cancelled those sessions. ALJ Decision at 3; GC Ex. 12.  The parties then agreed to meet on March 21 and 22, 2013. ALJ Decision at 3-4; GC Ex. 14.

On March 19, Shurling received a letter from PTI's counsel, Jon Goldman, stating that Tevault would not be meeting with the Union on March 21 in light of <u>Noel Canning</u>. GC Ex. 15.  Goldman also stated that "PTI is not refusing to bargain at reasonable times and places with Local 512.  PTI simply wishes to better understand the law in this complex situation as it moves forward in Jacksonville."  <u>Id.</u>  The Union showed up for the March 21, 2013 bargaining session; PTI did not.  ALJ Decision at 4; ALJ Tr. at 50.  The Union filed the original unfair labor practice charge with the Board on March 25, 2013.  GC Ex. 1(a).

On April 22, 2013, Tevault and Shurling discussed additional bargaining dates, and settled on June 4, 5, and 6, 2013. ALJ Decision at 4; GC Ex. 16.  Tevault emailed Shurling to confirm these dates on April 24, 2013, and in doing so, mentioned PTI's "Noel Canning [sic] defense."  GC Ex. 16. Shurling responded on April 26 stating his opposition to PTI's position regarding <u>Noel Canning</u>.  <u>Id.</u>  On May 31, Tevault again emailed Shurling, confirming the June 4, 5, and 6, meetings and again raising PTI's "reservation of rights based upon" <u>Noel Canning</u>.  GC Ex. 17.  On June 3, Tevault asked Shurling to confirm his receipt of his "previous email" and that Shurling was "in agreement to continue negotiations as stated." <u>Id.</u>  Shurling replied stating that he was in agreement to meet but his "position remains as previously stated in [his] April 26, 2013 e-mail concerning [Tevault's] reservation of rights and noel canning [sic]."  <u>Id.</u>  Late on the night of June 3, 2013, Tevault again emailed Shurling, stating:

> I want to be sure you understand what rights PTI is preserving.  They are as
> follows.  If, prior to the time a CBA is agreed to and ratified, a court of

competent jurisdiction determines the NLRB lacked a proper quorum at the time the Regional Director certified the bargaining unit in Jacksonville - PTI will stop negotiating and not recognize the election result.  If after a contract is agreed to and ratified a court of competent jurisdiction determines the NLRB lacked a proper quorum at the time the Regional Director certified the bargaining unit, PTI will consider the contract as void and not recognize the union.  If you meet with me tomorrow, you will by your conduct have agreed to accept this reservation of rights.  I will have a copy of this message to hand to you tomorrow unless you tell me you do not or cannot meet.

Id. Shurling replied the next morning stating his objection to PTI's "bargaining terms."  Id.

Following this exchange of correspondence, the parties met briefly on June 4, 2013. ALJ Tr. at 56.  At this meeting, Tevault again expressed PTI's position that the Company was reserving its rights under <u>Noel Canning</u>.  ALJ Decision at 6; ALJ Tr. at 56.  Shurling responded that the Union was there to bargain and get a fair contract for its members, but that the Union would not agree to PTI's conditions.  ALJ Tr. at 57.  After additional back-and-forth, Tevault stated "that if [PTI and the Union] couldn't agree to the conditions, that there was no need in proceeding forward."  ALJ Tr. at 58.  Shurling and his negotiating team then left the session because, according to Shurling, since Tevault "had said that there was no need in proceeding forward, [Shurling] took that to mean that they weren't going to bargain with us" and "[t]here was no need to proceed forward."  Id.  PTI made no bargaining proposals at this June 4 meeting, and did not seek clarification of any of the Union's proposals. Id. The only matter discussed was whether the Union would agree to PTI's <u>Noel Canning</u> reservation of rights.  Id.  No further bargaining has occurred. Regional Director Memo at 12.

### D.    Impact of PTI's Alleged Unfair Labor Practices on Unit Employees[4]

In order to show the impact of PTI's alleged unfair labor practices on the Unit employees, the Regional Director offers the testimony of two Union bargaining committee members.  The first witness, Roosevelt Torrence, testified that on June 4, 2013, Unit employee Dexter Rhodes asked Torrence about the progress of the bargaining.  ALJ Tr. at 95.  Torrence told Rhodes that PTI "wanted to negotiate the contract under certain conditions."  Id.  Torrence testified, "Rhodes' response was like he didn't quite understand, you know, the Canning law stuff" and that Rhodes also "said that that was kind of bad, that since we didn't make enough money, you know that he felt like – I mostly think he felt like we was being let down, you know, the Union had let him down."  ALJ Tr. at 95-96.  According to Torrence, Rhodes said "that he thinks we should be making more [than minimum wage]."  ALJ Tr. at 96. On June 7, 2013, Torrence was approached by two Unit employees, Johnnie Atkins and Mr. Reynolds.  ALJ Tr. at 97-98.  Torrence testified that he explained to Atkins and Reynolds that PTI wanted to negotiate the contract under the condition of "the Noel Canning law."  ALJ Tr. at 98.   According to Torrence, Atkins and Reynolds "felt like the system had let them down" and "that wasn't nothing going to happen" and were "saying that they was getting tired."  Id.  Torrence also testified that Atkins and Reynolds "said that they

---

[4] The ALJ did not rely upon the following set of facts in making his decision since these facts are relevant only to the question of whether temporary injunctive relief under § 10(j) is "just and proper," and the ALJ's determination was limited to whether PTI violated the NLRA. See ALJ Tr. at 88-93.  The ALJ allowed this testimony for the sake of efficiency, and to apprise PTI of what evidence the Regional Director would be relying upon in the district court. See ALJ Tr. at 91.  The ALJ did specifically note, however, that he would not "make credibility resolutions at all with respect to just and proper evidence." ALJ Tr. at 90.

   PTI's attorney objected several times to this testimony as hearsay. See ALJ Tr. at 96-102. However, because this testimony is not being offered for the truth of the matter asserted but to demonstrate the impact of PTI's actions, it is not hearsay testimony and is admissible.

couldn't understand, you know, why would [sic] PTI wouldn't negotiate with them and that we should make [more than minimum wage]."  ALJ Tr. at 99.

The Regional Director also presented the testimony of Harvey Lee Sherman, another employee bargaining committee member.  See ALJ Tr. 101-05.  Sherman testified that he, too, was asked by Unit employees about the status of bargaining. ALJ Tr. at 102-03. Specifically, Sherman testified that one employee named Victor "asked [Sherman] what was taking so long." ALJ Tr. at 103.  Sherman testified that Victor admitted "he was scared . . . because it seemed like they was trying to wean out the people," meaning that he (Victor) was scared "they were going to try to get rid of the people that had voted for the Union" and "was scared . . . that he was going to lose his job." Id.  Sherman also testified that when speaking with another employee, Vernon Smith, about the status of bargaining, Vernon responded by "talking about how the senior drivers are getting shorter runs" than the new hires.[5] ALJ Tr. at 103-04.  Another employee named Dexter[6] asked Sherman about the negotiations, to which Sherman responded the PTI had "skipped some of the meetings."  ALJ Tr. at 105. According to Sherman, Dexter's response was that if the Company had attended the meetings "the contract would have probably been in by now."  Id.  Sherman also testified that Dexter asked about "back pay from the time [the Unit] voted them in to now."  Id.

---

[5] With respect to the hearsay objection as to this testimony, the Court notes that the Union did not submit this testimony to show that PTI was, in fact, trying to wean out employees or that it was giving senior drivers shorter routes.  Rather, the Union submitted this testimony to show the effect the delayed bargaining was having on the Union members.

[6] As PTI points out, see PTI Memo at 18, it is unclear whether this person named Dexter is the same Dexter that spoke with Roosevelt.

## II.    The ALJ Decision

The ALJ issued his decision on October 22, 2013.  The first issue the ALJ addressed was whether PTI's cancelling of seven consecutive, previously scheduled bargaining sessions (February 21 and 22, 2013; March 5, 6, and 7, 2013; and March 21 and 22, 2013) constituted dilatory tactics in violation of the duty to bargain in good faith under § 8(a)(5) of the NLRA.  ALJ Decision at 7.  The ALJ found that PTI's cancelling of the bargaining sessions constituted dilatory conduct, purposeful delay, and a failure of its obligation to meet and bargain. ALJ Decision at 7, 8.[7]

Next, with regard to PTI's "setting conditions on further bargaining with the Union" in light of Noel Canning, the ALJ found that PTI cannot "lawfully insist on the conditional bargaining restrictions it demanded without violating its duty to bargaining [sic] in good faith with the Union."  ALJ Decision at 8, 9.  Specifically, the ALJ found that PTI

> here is simply attempting to challenge or test the Regional Director's certification of the Union as the bargaining representative of a unit of [PTI's] employees.  The Union had already been validly certified on June 5, 2012. There has been no final determination the Board lacked a proper quorum at the time the certification issued.  Thus, the certification and actions related thereto are binding on the parties and applicable here.  There is no merit to the argument that a party's responsibilities under the Act are somehow relieved or suspended, or that a party may insist on conditional bargaining, while awaiting the outcome of pending litigation in the courts of appeals. Bob's Big Boy Family Restaurants 264 NLRB 432, 434 (1982).  The same, I am persuaded, applies to cases pending before the United States Supreme Court on certiorari.  Even if the United States Supreme Court should uphold Noel

---

[7] Although seemingly not the determinative set of actions in the ALJ's decision, the ALJ also cited the fact that the Union requested bargaining dates from PTI on June 5, 2012, but PTI replied that Tevault was not available until August 2012.  ALJ Decision at 7. The ALJ cited the fact that when PTI and the Union met for the first time on September 25, 2012, PTI presented no proposals or counter-proposals, and that at the November 15, 2012 session, PTI again presented no proposals or counter-proposals. Id.  The ALJ also noted that by the end of the January 24, 2013 session, the parties had not reached any other tentative agreements than those reached at their November 16, 2013 meeting. Id.

> Canning the matter likely would be remanded, through the courts, to the Board
> for further consideration in light of the Supreme Court's holding and the Board
> could, if it chose, reaffirm the Board's earlier actions related to the certification
> of representative.

ALJ Decision at 9.   Thus, the ALJ found that "[t]he Company's demand for conditional

bargaining here violates its duty to bargain in good faith." Id.[8]

In conclusion, the ALJ found that PTI "has failed and refused to meet and bargain with

the Union, and, has by its overall conduct, failed and refused to bargain in good faith with the

Union as the exclusive-collective[-]bargaining representative of the Unit in violation of § 8(a)

(5) [sic] and (1) of the Act" by cancelling bargaining sessions and by conditioning bargaining

with the Union on the outcome of the Noel Canning case. ALJ Decision at 10.

**III.   Applicable Law**

    **A.      Sections 8(a)(1) and (5) of the NLRA**

Sections 8(a)(1) and (5) of the National Labor Relations Act, as amended, 29 U.S.C.

§ 158(a)(1) and (5) provide that "It shall be an unfair labor practice for an employer– **(1)** to

interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in

section 157  of this title[9] . . . [or] **(5)** to refuse to bargain collectively with the representatives

---

[8] The ALJ also noted that PTI "never challenged the Regional Director's certification of the Union in June 2012, but rather began negotiating with the Union for employees in the Unit."  ALJ Decision at 9.  Thus, according to the ALJ, PTI, "by its actions, voluntarily recognized the Union as the collective-bargaining representative of the unit employees." Id. Additionally, the ALJ noted that PTI "never challenged the conduct surrounding the holding of the representation election nor the outcome of the election."  Id.

[9] Section 157 provides:

> Employees shall have the right to self-organization, to form, join, or
> assist labor organizations, to bargain collectively through
> representatives of their own choosing, and to engage in other
> concerted activities for the purpose of collective-bargaining or other

(continued...)

of his employees, subject to the provisions of section 159(a) of this title."[10]  The duty to

bargain in good faith is defined by § 8(d) of the NLRA, as amended, 29 U.S.C. § 158(d),

which provides:

> For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession[.]

---

[9](...continued)
mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

29 U.S.C. § 157.

[10] Section 159(a) provides:

(a) Exclusive representatives; employees' adjustment of grievances directly with employer

Representatives designated or selected for the purposes of collective-bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective-bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: Provided, That any individual employee or a group of employees shall have the right at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect: Provided further, That the bargaining representative has been given opportunity to be present at such adjustment.

29 U.S.C. § 159(a).

29 U.S.C. § 158(d) (emphasis added).  An employer's good faith bargaining obligation can arise in several ways, such as when a union is certified by the Board.[11]  See Section 9(c)(1) of the NLRA, as amended, 29 U.S.C. § 159(c)(1).  The duty also arises when, through delegated authority, the Regional Director certifies a union as the exclusive collective-bargaining representative of a unit of an employer's employees.  See Section 3(b) of the NLRA, as amended, 29 U.S.C. § 153(b).[12]  Additionally, the duty can arise when an employer voluntarily recognizes a union that represents an uncoerced majority of the employees in an appropriate bargaining unit.  See Int'l Ladies' Garment Workers Union, AFL-CIO v. N.L.R.B., 280 F.2d 616, 619 (D.C. Cir. 1960), aff'd, 366 U.S. 731 (1961) (stating that "the decision whether or not to be represented by a bargaining representative and also the choice of that representative shall be the uncoerced decision of a majority of the employees in an appropriate unit").  Regardless of how it arises, "[t]he obligation to bargain collectively . . . encompasses the affirmative duty to make expeditious and prompt arrangements, within

---

[11] See Brooks v. N.L.R.B., 348 U.S. 96, 103-104 (1954) (holding that an employer has a duty to bargain in good faith for one year beginning on the date of certification of the bargaining representative by the Board).

[12] Section 153(b) provides that the

> Board is also authorized to delegate to its regional directors its powers under section 159 of this title to determine the unit appropriate for the purpose of collective-bargaining, to investigate and provide for hearings, and determine whether a question of representation exists, and to direct an election or take a secret ballot under subsection (c) or (e) of section 159 of this title and certify the results thereof, except that upon the filing of a request therefor with the Board by any interested person, the Board may review any action of a regional director delegated to him under this paragraph, but such a review shall not, unless specifically ordered by the Board, operate as a stay of any action taken by the regional director.

29 U.S.C.A. § 153(b).

reason, for meeting and conferring." In re J.H. Rutter-Rex Mfg. Co., Inc., 86 NLRB No. 68, at 506 (1949).

**B.     Section 10(j) of the NLRA**

"[S]ection 10(j) of the National Labor Relations Act gives the [National Labor Relations] Board the power, upon issuance of a complaint charging that a person has engaged in or is engaging in an unfair labor practice, to petition the district court for appropriate temporary relief or a restraining order." Diaz v. Hartman & Tyner, Inc., No. 12-60978-MC-ZLOCH, 2012 WL 2513485, at *1 (S.D. Fla. June 29, 2012), aff'd, 714 F.2d 1244 (11th Cir. 2013).  Specifically, the statute provides:

> The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

29 U.S.C. § 160(j).  The Eleventh Circuit Court of Appeals has recognized that "Congress enacted § 10(j) because administrative resolution 'was so time-consuming that guilty parties could violate the Act with impugnity [sic] during the years of pending litigation, thereby often rendering a final order ineffectual or futile.'" Arlook v. S. Lichtenberg & Co., 952 F.2d 367, 371 (11th Cir. 1992) (quoting Boire v. Pilot Freight Carriers, Inc., 515 F.2d 1185, 1188 (5th Cir. 1975)[13] (alteration in original)).  "Thus, [§] 10(j) plays an important role in preserving

---

[13] In Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1207 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

meaningful administrative resolution of unfair labor practices claims." N.L.R.B. v. Hartman & Tyner, Inc., 714 F.3d 1244, 1249 (11th Cir. 2013) (citing Pilot Freight, 515 F.2d at 1188). However, "care must be taken so that [§ 10(j)] remains 'an extraordinary remedy, to be requested by the Board and granted by a district court only under very limited circumstances.'" Id. (quoting Arlook, 952 F.2d at 374).  Indeed, in a decision binding on this Court, the former Fifth Circuit Court of Appeals stated, "We believe that measures to short-circuit the NLRB's processes should be sparingly employed."  Pilot Freight, 515 F.2d at 1192.

To determine the propriety of temporary relief pursuant to § 10(j), a district court in the Eleventh Circuit must engage in a two-part inquiry, assessing: "(1) whether the Board, through its Regional Director, has reasonable cause to believe that unfair practices have occurred, and (2) whether injunctive relief is equitably necessary, or, in the words of the statute, 'just and proper.'" Hartman, 714 F.3d at 1250 (citing Pilot Freight, 515 F.2d at 1188-89 and Arlook, 952 F.2d at 371).

Where, as here, the Regional Director seeks an injunction following an ALJ decision but prior to a decision on the merits by the NLRB, the Court "may not only consider the underlying charge and supporting evidence, but may also consider relevant findings and legal determinations of the ALJ."  See Garcia v. Fallbrook Hosp. Corp., No. 13CV1159-GPC(WMC), 2013 WL 3368979, at *3 (S.D. Cal. June 7, 2013).  Indeed, a "district court does not sit in review of the ALJ's decision but should consider the ALJ's findings relevant in its determination." Id.; see also Bloedorn v. Francisco Foods, Inc., 276 F.3d 270, 288 (7th Cir. 2001) ("[A]lthough we do not sit in review of the ALJ's decision[,] . . .  his opinion is

nonetheless relevant to the propriety of [§] 10(j) relief. . . . Having presided over the merits

hearing, the ALJ's factual and legal determinations supply a useful benchmark against which

the Director's prospects of success may be weighed."). Notably, the Eleventh Circuit has

directed that "credibility resolutions are peculiarly within the province of the ALJ and the

Board and are entitled to deference unless inherently unreasonable or self-contradictory."

N.L.R.B. v. United Sanitation Serv., Div. of Sanitas Serv. Corp., 737 F.2d 936, 938 (11th Cir.

1984).

> ### 1.      The Reasonable Cause Prong

When faced with a § 10(j) petition, a

> district court's role in determining whether or not there is
> reasonable cause to believe that labor violations have occurred
> is limited to evaluating whether the Board's "theories of law and
> fact are not insubstantial and frivolous." Pilot Freight, 515 F.2d
> at 1189. This evaluation has two components-a legal question,
> and a factual threshold. With respect to the first component, the
> standard is clear-the Board must present a substantial,
> nonfrivolous, coherent legal theory of the labor violation. [Boire
> v. Int'l Bhd. of] Teamsters, 479 F.2d [778,] 792 [(5th Cir.
> 1973)].[14]
>
>       . . . [I]n order to prove reasonable cause, the Board must
> present enough evidence in support of its coherent legal theory
> to permit a rational factfinder, considering the evidence in the
> light most favorable to the Board, to rule in favor of the Board.[15]

---

[14] The former Fifth Circuit directed that "the District Court should not engage in a dispositive analysis of the legal issues involved in the underlying unfair labor practice proceedings and should examine them only as far as necessary to determine whether the theories are insubstantial or frivolous." Boire v. Int'l Bhd. of Teamsters, 479 F.2d 778, 792 (5th Cir. 1973).

[15] Citing the Eleventh Circuit's Arlook decision, the Fifth Circuit has noted that "[t]his threshold is significantly lower than a requirement to show 'irreparable harm' and 'likelihood of success.'" Overstreet v. El Paso Disposal, L.P., 625 F.3d 844, 851 n.10 (5th Cir. 2010).

Arlook, 952 F.2d at 371.[16]  In conducting this analysis, a district court must not weigh the evidence presented to it, in an effort to decide, "whether or not, in fact, the employer engaged in unfair labor practices" because "[t]he ultimate determination of whether there have been unfair labor practices is for the NLRB." Kentov v. Point Blank Body Armor, Inc., No. 02-61716-CV, 2003 WL 253063, at *8 (S.D. Fla. Jan. 30, 2003) (citing Arlook, 952 F.2d at 372, 372-373).  Rather, a district court's role is to decide "whether or not the evidence, considered in the light most favorable to the Board," would permit "the conclusion that a rational factfinder might eventually rule in favor of the Board." Arlook, 952 F.3d at 373 (emphasis in original).

### 2.    The Just and Proper Prong

The "just and proper" portion of the inquiry addresses the "issue of equitable necessity of injunctive relief." Kentov, 2003 WL 253063, at *11.  Under § 10(j), a district court may "grant to the Board such temporary relief or restraining order as it deems just and proper." 29 U.S.C. § 160(j).  The Eleventh Circuit has instructed that "[i]njunctive relief under § 10(j) is 'just and proper' whenever the facts demonstrate that, without such relief, 'any final order of the Board will be meaningless or so devoid of force that the remedial purposes of the [NLRA] will be frustrated.'" Arlook, 952 F.2d at 372 (citing Pilot Freight, 515 F.2d at 1192)

---

[16] The Eleventh Circuit in Arlook reversed the district court's "reasonable cause" analysis, deciding that the

> district court should not have weighed all the evidence presented to it, in an effort to decide whether or not, in fact, the Company unilaterally changed the absenteeism and buzzer rules and unfairly refused to bargain with the Union. By doing so, a district court usurps the statutory powers of the Board.  See Pilot Freight, 515 F.2d at 1191.

Arlook, 952 F.2d at 372-73 (citation omitted) (emphasis in original).

(alteration in original).  While the Eleventh Circuit in Arlook "decline[d] to delineate an entire list of factors which might animate the district court's determination of equitable necessity[,]" it did identify factors relied upon by other courts in finding § 10(j) relief to be "just and proper," including: (1) "when organizational efforts are highly susceptible to being extinguished by unfair labor practices[;]" (2) "when unions and employees have already suffered substantial damage from probable labor violations[;]" and (3) "when the violations reasonably found to have been committed will be repeated absent an injunction." Id. (citations omitted).

IV.     Discussion

A.     Reasonable Cause

With respect to the question of reasonable cause, the Board must first present "a substantial, nonfrivolous, coherent legal theory of the labor violation." Arlook, 952 F.3d at 371 (citing Teamsters, 479 F.2d at 792).  Next, the Board must "present enough evidence in support of its coherent legal theory to permit a rational factfinder, considering the evidence in the light most favorable to the Board, to rule in favor of the Board." Id.  The Regional Director's theory in this case is that PTI violated §§ 8(a)(1) and (5) of the NLRA by: (1) refusing to meet and bargain collectively in good faith by cancelling every bargaining session scheduled after January 24, 2013, and (2) conditioning resumption of bargaining on the outcome of the Noel Canning decision.[17]  See Regional Director Memo at 15-19.

---

[17] The Court does not address the Regional Director's contention that PTI waived its right to challenge the certification of the Union.  This argument is not, in itself, a separate alleged unfair labor practice.

### 1.   PTI's Cancellation of the Bargaining Sessions

"In determining whether an employer has violated [§] 8(a) of the NLRA, the employer's conduct must be considered in light of all of the circumstances." Mead Corp. v. N.L.R.B., 697 F.2d 1013, 1022 (11th Cir. 1983) (citing N.L.R.B. v. Randle-Eastern Ambulance Serv., Inc., 584 F.2d 720, 725 (5th Cir. 1978)). "[S]incerity of effort and intention to arrive at and consummate an agreement are requirements" of § 8(a), and the "absence" of these things "constitutes an unfair labor practice." N.L.R.B. v. Nat'l Shoes, Inc., 208 F.2d 688, 691 (2d Cir. 1953). Here, the Regional Director contends that PTI's duty to bargain in good faith arose when the Regional Director certified the Union as the exclusive collective-bargaining representative of the Unit. See 29 U.S.C. § 153(b). An employer's duty to bargain requires compliance with the requirement to meet at reasonable times, to confer in good faith, to negotiate a contract, and on request, reduce the agreement to writing. See 29 U.S.C. § 158(d). However, this "obligation does not compel either party to agree to a proposal or require the making of a concession." Id.

The Regional Director has raised at least two coherent, not insubstantial legal theories: (1) that PTI has failed to meet at reasonable times and (2) that PTI has failed to confer in good faith. Determining whether a party has refused to meet at reasonable times is a "straightforward" task, and "[t]estimony and bargaining notes will establish how many times a party offered to meet, how many times the party refused to meet, and how often the parties really did meet." Garden Ridge Mgmt., Inc., 347 NLRB No. 13, at *20 (2006). Once the Court "has ascertained how often a party was willing to meet, the next step is to determine whether this amount constitutes a 'reasonable' number of times." Id. at *21.

PTI argues that the facts before the Court "fail to support the Regional Director's legal theory that PTI cancelled seven bargaining sessions and, thus, failed to bargain in good faith." PTI Memo at 14.  Rather, PTI asserts that "[e]ach time Local 512 communicated a desire to meet, PTI attempted to accommodate Local 512 as to date, time, and location." Id. at 15.  PTI also argues that Shurling testified and admitted the parties had a "cordial business relationship." See id. at 2-3.

Despite PTI's arguments to the contrary, the Regional Director has presented sufficient evidence in support of its failure to bargain claim.  The evidence in the record indicates that even before Noel Canning was decided, PTI did not attempt to meet with the union in June or July 2013.  The parties met once in September 2012, twice in November 2012, and once in January 2012.  PTI then cancelled the next seven meetings.[18]  On these facts, a rational factfinder could certainly conclude that PTI's bargaining behavior was characterized by purposeful delay and other dilatory tactics.[19]  See Nat'l Shoes, 208 F.2d at 692 (deciding that the employer engaged in an unfair labor practice in violation of § 8(a)(5) where the record contained evidence of "[l]ong delays unaccounted for in the matter of correspondence and the preparation of documents, the postponement of meetings of the negotiators for weeks at a time, and the reopening of questions previously settled");

---

[18] The record also indicates that although PTI presented some counter-proposals at two of the meetings, PTI never presented any of its own contract proposals.

[19] The record appears to confirm that the parties maintained a cordial business relationship. However, this fact does not negate PTI's actions in repeatedly cancelling scheduled bargaining sessions. See Nat'l Shoes, 208 F.2d at 692 (pointing out that "[t]he record in this case discloses none of the hostility or bitterness which is sometimes engendered in labor-management disputes" yet still finding the employer in violation of the NLRA).  Indeed, in finding PTI's actions constituted an unfair labor practice, the ALJ noted that "[n]either is it a defense to a violation, as found here, that the parties conducted the negotiations they did in a friendly manner."  ALJ Decision at 8.

Overstreet v. El Paso Disposal, L.P., 625 F.3d 844, 854-55 (5th Cir. 2010) (finding "more than 'reasonable cause' for the Board to conclude that [the employer] engaged in bad faith bargaining" where the employer delayed the initial bargaining session for four months and attended only fourteen bargaining sessions over a thirteen-and-one-half month period); see also Calex Corp., 322 NLRB No. 177, at 977-78 (1997) (finding that the employer violated § 8(a)(5) where the employer cancelled at least three scheduled meetings between January and May, and where the parties met only three times during that period). Indeed, the ALJ, after an evidentiary hearing, found that PTI's "cancelling of seven consecutive previously scheduled bargaining sessions . . . constitutes dilatory conduct and is a failure of its obligation to meet and bargain." ALJ Decision at 7.

As articulated by the ALJ, PTI's unilateral cancellation of seven agreed-upon bargaining sessions and its less-than-enthusiastic participation in the sessions that its negotiators actually attended demonstrate that PTI "considered negotiating with the Union, for an initial contract, an inconvenience for the Company." ALJ Decision at 8; see also A. H. Belo Corp. (WFAA-TV) v. N.L.R.B., 411 F.2d 959, 968 (5th Cir. 1969) (deciding that the employer engaged in dilatory tactics in "causing negotiations to drag out over a year[,] . . . delay[ing] negotiations two months in order to reply to the union's original proposal, and when it did, counter[ing] with a sketchy four page paper"). On this record, the Board has carried its burden of presenting a substantial, nonfrivolous, coherent legal theory of an unfair labor practice, and sufficient evidence to support that theory, with respect to PTI's cancellation of the bargaining sessions.

### 2.    PTI's Alleged Conditional Bargaining

The Regional Director also asserts that there is reasonable cause to believe that PTI violated §§ 8(a)(1) and (5) of the NLRA by PTI's "conditioning of the resumption of bargaining on the Union's agreement that in the event the U.S. Supreme Court affirms . . . Noel Canning, [PTI's] bargaining obligation would cease, and the Union's certification and any collective-bargaining agreement reached between the parties would be null and void." Regional Director Memo at 17-18 (footnotes omitted); see also GC Ex. 17.  PTI asserts that its actions did not amount to conditional bargaining but rather, "PTI told [the Union] that it was willing to continue bargaining for a collective[-]bargaining agreement, but that it wished to reserve certain rights based upon the significant uncertainty created by the Noel Canning decision."  PTI Memo at 7.

It is undisputed that conditional bargaining does not constitute bargaining in good faith under §§ 8(a)(5) and (1) of the NLRA.  See Fred Meyer Stores, Inc., 355 NLRB No. 30 at *1 n.1 (2010), enf'd, 466 Fed. App'x 560 (9th Cir. 2012); see also Brooks, Inc., 228 NLRB No. 154, at 1366 (1977), enf'd in relevant part, 593 F.2d 936 (10th Cir. 1979).  As such, PTI attempts to distinguish its actions, asserting that its "'reservation of rights'" is "fundamentally different" from the "conditions imposed and complained of in traditional 'conditional bargaining' cases."  See PTI Memo at 11-13.  PTI is correct that the specific conditions imposed in many of the traditional cases are factually distinct from PTI's condition or "reservation of rights" concerning Noel Canning.  See, e.g., S&M Mfg. Co., 165 NLRB No. 59, 664 (1967) (finding that the employer engaged in bad-faith bargaining in violation of §§ 8(a)(5) and (1) in submitting its contract proposal to the union conditioned upon its

acceptance that same day).   However, the common feature in traditional conditional bargaining cases and the instant case is the employer "hold[ing] future negotiations hostage to unilaterally imposed demands[.]"  Caribe Staple Co., 313 NLRB No. 151, 894, 888 (1994). For example, the NLRB has found an employer's demand that the union relinquish the right to bring an unfair labor practice grievance to be illegal conditional bargaining.  See Palm Beach Post-Times Div., Perry Publ'n, Inc., 151 NLRB No. 114, 1047 (1965), enf'd, 375 F.2d 118 (5th Cir. 1967); Fitzgerald Mills Corp., 133 NLRB No. 98, 884 (1961), enf'd, 313 F.2d 260 (2d Cir. 1963).  Here, PTI similarly demands that the Union agree that its certification is void and any collective-bargaining agreement reached would be null and void if Noel Canning is affirmed.  However, even if the Supreme Court affirms Noel Canning, such a decision would not necessarily require the setting aside of the certification and any contract reached between PTI and the Union.  Indeed, the ratification process which followed the decision in New Process Steel, L.P. v. N.L.R.B., 560 U.S. 674 (2010), where the Court invalidated all actions taken by the Board without a proper quorum over a two-year period, suggests one alternative outcome that would allow the certification and contract to stand. Additionally, parties seeking to uphold decisions made by the Board prior to a final decision in Noel Canning might argue for the "de facto validity" of those decisions citing Buckley v. Valeo, 424 U.S. 1 (1976).  The Supreme Court itself may opt to fashion a remedy to address the affect of its decision to prevent unnecessary disruption, chaos, and litigation.  How the Court might choose to do so remains to be seen.  But PTI demanded that the Union entirely give up the certification and any contractual rights if Noel Canning is affirmed regardless of

the fact that an affirmance of <u>Noel Canning</u> does not necessarily demand such an outcome.[20]

On these facts, the Regional Director has demonstrated the Board has reasonable cause to believe PTI engaged in conditional bargaining in violation of §§ 8(a)(5) and (1) of the NLRA.[21]  The Court emphasizes that its role under the "reasonable cause" inquiry is not to decide whether PTI did, in fact, engage in conditional bargaining.  Indeed, PTI does not dispute that the Regional Director need only present a substantial, nonfrivolous, coherent legal theory and offer sufficient evidence, considered in the light most favorable to the Board, to permit the conclusion that a rational factfinder might eventually rule in favor of the Board. This is not an onerous or heavy burden, and the Regional Director has met that burden here.

---

[20] The Court acknowledges PTI's demonstrated willingness to bargain.  However, it did so under its unilateral terms relating to <u>Noel Canning</u>.  While PTI describes these bargaining terms benignly as a "reservation of rights," <u>see</u> PTI Memo at 11, and as a "safe harbor," <u>see</u> Hearing Tr. at 28, its bargaining terms required the Union to agree that i<u>f Noel Canning</u> were to be upheld, any negotiated and agreed-to contract would be voided automatically, a result that may or may not be the remedy that follows from an affirmance of <u>Noel Canning</u>.

[21] The Court's determination is, once again, supported by the ALJ's decision that PTI could not "lawfully insist on the conditional bargaining restrictions it demanded without violating its duty to bargaining [sic] in good faith with the Union."  ALJ Decision at 9.  In so deciding,  the ALJ determined that a party's responsibilities under the NLRA are not "relieved or suspended" and a party may not "insist on conditional bargaining, while awaiting the outcome of pending litigation in the courts of appeals."  <u>Id.</u>
    The ALJ's finding of conditional bargaining also was based, in part, on his determination that PTI was "simply attempting to challenge or test the Regional Director's certification of the Union as the bargaining representative of a unit of the Company's employees."  <u>Id.</u>  The Court recognizes that the Regional Director takes this position in arguing that a "finding of reasonable cause . . . is especially warranted" because PTI "has waived its right to challenge the validity of the Certification of Representative issued by the Regional Director."  Regional Director Memo at 18-19.  However, because the Court has determined that there is reasonable cause to believe labor violations occurred, the Court need not decide whether PTI's alleged waiver makes its bargaining conduct more egregious.

**B.    Just and Proper**

Having found that reasonable cause exists to believe that the alleged unfair labor practices have occurred, the Court now turns to whether injunctive relief is "just and proper." The Regional Director primarily seeks two forms of injunctive relief: (1) an injunction preventing PTI from failing and refusing to bargain, from cancelling meetings previously scheduled with the Union, and from conditioning bargaining on the pendency of Noel Canning; and (2) an injunction requiring PTI to meet and bargain in good faith with the Union, to make the Court's order available to Unit employees, and to submit a sworn affidavit showing compliance with the Court's order.[22]   See Petition at 8-11.  The Regional Director asserts that this relief is just and proper because PTI's "refusal to recognize and bargain in good faith with the Union is likely to cause irreparable harm to employee support for the Union before the Board issues an order in this case unless [PTI] is enjoined from continuing its unlawful course of conduct."  Regional Director Memo at 19.  The Regional Director argues that PTI's conduct is especially harmful in this instance because the Union is negotiating an initial contract, so there is no history of negotiations between the parties to help demonstrate the Union's ability to reach a collective-bargaining agreement.  Id. at 20. In response, PTI argues that the testimony offered by the Regional Director "fails to support the Regional Director's claim that support of Local 512 is decreasing as a result of the time spent negotiating a collective[-]bargaining agreement."  PTI Memo at 18.  Rather, PTI

---

[22] In addition to these specific prohibitions, the Regional Director also seeks an injunction prohibiting PTI from interfering with, restraining or coercing employees in the exercise of rights guaranteed under § 7 of the NLRA.

describes the testimony offered by the Regional Director as vague, lacking credibility, and unsubstantiated. Id. at 18-19.

Upon review of the evidence and the parties' written and oral arguments, the Court is unconvinced that absent temporary injunctive relief, "any final order of the Board will be meaningless or so devoid of force that the remedial purposes of the NLRA will be frustrated." Hartman, 714 F.3d at 1250 (citing Arlook, 952 F.2d at 372). The record evidence, specifically the testimony of employee bargaining committee members Roosevelt Torrence and Harvey Sherman, does not demonstrate that PTI's alleged unfair labor practices have diminished employee support to the point that awaiting a final Board order will erode the Union's ability to bargain. Further, the Court notes that much of the evidence offered by the Regional Director is essentially speculation by the witness of the Unit employees' feelings. See ALJ Tr. at 95 (Torrence testifying, "I mostly think he felt like we was being let down, you know, the Union had let him down."); see also ALJ Tr. at 98 (Torrence testifying that two employees "felt like the system had let them down" and "that wasn't nothing going to happen"). Thus, while the testimony offered by the Regional Director indicates a degree of impatience among employees with the status of bargaining, as well as frustration over making minimum wage, there is no evidence to indicate that the employees are losing faith in the Union's ability to negotiate a contract.[23]

The record before the Court suggests that PTI has refused to bargain in good faith. However, the record is notably devoid of any specific evidence of harm that has befallen the

---

[23] Moreover, the Regional Director has not supplemented the record beyond the testimony offered at the August 8, 2013 ALJ hearing, and PTI asserts that there have been no other charges filed, no termination of any employees, and no threats made toward any employees. Hearing Tr. at 35. As such, the Court has no reason to conclude that conditions have worsened in recent months.

Unit employees as a result of PTI's alleged unfair labor practice.  Although Sherman testified that an employee named Victor said "he was scared . . . because it seemed like [management] was trying to wean out the people . . . that had voted for the Union," <u>see</u> ALJ Tr. at 103, the Court declines to put any weight on this evidence as the Regional Director presented no evidence to support Victor's speculation, and PTI affirmatively denies it.  <u>See</u> Hearing Tr. at 35.

In further support of its position, the Regional Director points to <u>Arlook</u>, arguing that injunctive relief was just and proper there because the employer refused to bargain for the parties' first contract.  <u>See</u> Regional Director Memo at 22 n.21; Hearing Tr. at 17-18. However, the Regional Director oversimplifies the Eleventh Circuit's reasoning in <u>Arlook</u>.  In that case, the necessity of a temporary injunction also turned on the "substantial evidence" in the record "of actual damage inflicted by the management's actions"[24] demonstrating that support for the union  had significantly weakened, rendering a final Board order likely ineffective.[25]  <u>Arlook</u>, 952 F.2d at 373.  Moreover, the <u>Arlook</u> court determined that an injunction was proper where damage would likely continue absent interim relief since the employer's conduct "span[ned] the gamut of labor violations."  <u>Id.</u> at 373-74.  This precedent

---

[24] This evidence included the testimony of several employees that they were afraid to wear union clothing and stickers, participate in union activities, actively recruit new union members, and become stewards of the union, and further, that they feared termination.  <u>Arlook</u>, 952 F.2d at 373.

[25] The Regional Director similarly cites <u>Lineback v. Spurlino Materials, LLC</u>, 546 F.3d 491, 500-01 (7th Cir. 2008) for the proposition that the "passage of time [is] critical in cases involving 'fledgling unions.'"  <u>See</u> Regional Director Memo at 22 n.21.  However, that case is also distinguishable in that in upholding § 10(j) relief, the Seventh Circuit credited the district court's reliance on significant evidence of management misconduct and a "precipitous decline in Union participation," evidence which is notably lacking in the instant case.  <u>Lineback</u>, 546 F.3d at 501.

simply fails to support the Regional Director's position given the facts of this case.[26]  Indeed, to issue a § 10(j) injunction on the facts and evidence in the instant case, which presents nothing more than a refusal to bargain in good faith over the course of less than a year, would render such a remedy anything but "extraordinary."  Here, where the Regional Director has failed to show substantial harm to the Union such that a final Board order would be rendered meaningless by PTI's alleged refusal to bargain, issuance of an injunction requiring interim bargaining would usurp the Board's powers.  Pilot Freight, 515 F.2d at 1192.

The Regional Director also relies upon Asseo v. Pan Am. Grain Co., 805 F.2d 23  (1st Cir. 1986), Garner v. MacClenny Prods., Inc., 859 F. Supp. 1478 (M.D. Fla. 1994), and Small v. Avanti Health Sys., LLC, 661 F.3d 1180 (9th Cir. 2011) as examples of a court granting an interim bargaining order under § 10(j) where the parties were bargaining for an initial contract.  However, like Arlook, Asseo and Garner are both distinguishable in that in both cases, there was significant evidence of employer misconduct such that a Board order would be rendered meaningless absent §10(j).  See Asseo, 805 F.3d at 29 (finding that the Board presented "significant evidence" of "egregious" unfair labor practices such as discriminatory dismissals and the employer threatening the employees with personal harm and plant closings); Garner, 859 F. Supp. at 1482 (finding that the evidence "tends to demonstrate that

---

[26] The Eleventh Circuit has recently considered §10(j) in N.L.R.B. v. Hartman & Tyner, Inc., 714 F.3d 1244 (11th Cir. 2013).  There, the court affirmed the district court's denial of temporary injunctive relief, finding that temporary reinstatement of discharged employees was not a just and proper remedy. See Hartman, 714 F.3d at 1249-1253.  While the instant case is distinguishable from Hartman where the union's organizational efforts had "already grown cold" before the alleged unfair labor practices occurred, see id. at 1250-51, the Regional Director has still failed to offer any significant evidence that PTI's alleged refusal to bargain has had a deleterious impact on employee support for the Union.

Respondent's actions were so pervasive and numerous as to render meaningless any final order of the administrative process").

Additionally, while the Court recognizes the Ninth Circuit's reasoning in <u>Small</u> in granting an interim bargaining order due to the fact that a Board order cannot provide retroactive relief and that an employer's refusal to bargain denies employees non-economic benefits, <u>see</u> <u>Small</u>, 661 F.3d at 1191-92, in this particular case, the Court declines to follow <u>Small</u> for two reasons. First, the Ninth Circuit applied the traditional four-prong preliminary injunction standard and highlighted those facts in its analysis of whether there was a "likelihood of irreparable harm." <u>See</u> <u>Small</u>, 661 F.3d at 1191-96. Courts in the Eleventh Circuit apply the two-prong "reasonable cause" and "just and proper" standard. Second, in determining the propriety of an interim bargaining order under § 10(j), binding precedent in this Circuit consistently focuses on whether "continuation of the non-bargaining status will so deleteriously affect the union that it cannot recover," not the considerations raised by the Ninth Circuit in <u>Small</u>. <u>Pilot Freight</u>, 515 F.2d at 1194;[27] <u>see</u> <u>also</u> <u>Arlook</u>, 952 F.2d at 374 ("Without an injunction, the Board's ability to foster peaceful labor negotiations through normal procedures would be imperiled."). In the instant case, the evidence simply does not demonstrate the erosion of Union support that would render ineffective a final order by the Board.

---

[27] In <u>Pilot Freight</u>, the former Fifth Circuit declined to issue an interim bargaining order due, in part, to the fact that no certification election had been held, and the union and the employer had never before enjoyed a bargaining relationship. <u>Pilot Freight</u>, 515 F.2d at 1193. The court did note, however, that "courts have not hesitated to issue interim bargaining orders where a pre-established bargaining relationship is being eroded by unfair labor practices." <u>Id.</u> at 1194. Although PTI and the Union have a pre-existing bargaining relationship, an injunction in this case is improper because the Regional Director has failed to show the requisite level of erosion of Union support.

The Court acknowledges that an interim bargaining order would be helpful to the Union in that it would require PTI to bargain in good faith, no strings attached. However, the Board cannot compel an employer to enter into a collective-bargaining agreement. See 29 U.S.C. § 158(d). Thus, an interim bargaining order requiring PTI to bargain in good faith and without conditions does not necessarily mean that the parties will enter into a contract or that PTI's employees will gain benefits that flow from a collective-bargaining agreement. Further, the standard is not simply whether an interim bargaining order might be, or even would be, beneficial to the Union. Rather, the standard is whether a final Board order would be meaningless without interim injunctive relief, and given the evidence in the record, the Court cannot conclude that the delay in bargaining has caused such an erosive effect. Thus, the Regional Director has failed to meet its burden of demonstrating that temporary injunctive relief is "just and proper."[28]

---

[28] In its briefings and at oral argument, PTI cited the Regional Director's eight-month delay in filing the Petition with this Court as evidence that injunctive relief should be denied. PTI Memo at 19; Hearing Tr. at 37. The Court recognizes that a delay in filing for § 10(j) relief is "some evidence" the Court may weigh in deciding the propriety of temporary injunctive relief. See Hartman, 714 F.3d at 1252 (citing Pilot Freight, 515 F.2d at 1193). According to PTI, this delay is "relevant because delay makes it difficult to justify granting temporary injunctive relief when that relief may not be any more effective than a final Board order several months after the alleged unfair labor practice occurred." PTI Memo at 19. However, the Eleventh Circuit has also instructed that district courts are not to "examine the delay for delay's own sake" but rather should assess whether the delay is further evidence of the "marginal benefit" a temporary injunction would offer as opposed to a final Board order. Hartman, 714 F.3d at 1252. While the Court declines to rest its decision on the Regional Director's delay in seeking §10(j) relief, the Court notes that even with the additional passage of time, the Union failed to identify and present evidence showing erosion of Union support due to the delay in bargaining. Morever, the Court is mindful of the procedural posture of the administrative proceeding. The ALJ has already issued his decision, and the parties are only awaiting a final Board order. As such, this case does not appear to present the likelihood that a party could violate the Act with impunity during years of litigation so that the final order would be meaningless. See Arlook, 952 F.2d at 371.

## V.    Conclusion

The Court concludes that while there is reasonable cause to believe that PTI has engaged in the unfair labor practices as alleged, the Regional Director has failed to convince the Court that it would be "just and proper" to enter an interim bargaining order.  The Court is not convinced that PTI's alleged refusal to bargain has or will cause such irreparable harm that a final Board order will be rendered meaningless.  Pilot Freight, 515 F.2d at 1194.  As such, the Regional Director's Petition for Preliminary Injunction Under § 10(j) of the National Labor Relations Act will be denied.

Accordingly, it is hereby **ORDERED**:

1.    The Regional Director's Petition for Preliminary Injunction Under Section 10(j) of the National Labor Relations Act (Doc.1) is **DENIED**.

2.    The Clerk of the Court is directed to enter judgment in favor of Professional Transportation, Inc., terminate all pending motions, and close the file.

**DONE AND ORDERED** at Jacksonville, Florida, this 29th day of January, 2014.

**MARCIA MORALES HOWARD**
United States District Judge

lc18

Copies to:

Counsel on record